DISTRICT OF OREGON
**F I L E D**
February 05, 2009
Clerk, U.S. Bankruptcy Court

Below is an Opinion of the Court.

RANDALL L. DUNN
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In Re: | ) Bankruptcy Case |
| | ) No. 08-34275-rld13 |
| MELVIN HIGHT GRIMES, | ) |
| | ) MEMORANDUM OPINION |
| Debtor. | ) |

The evidentiary hearing ("Hearing") on Countrywide Home Loans, Inc.'s ("Countrywide") objection to confirmation of the debtor Melvin Hight Grimes' ("Mr. Grimes") chapter 13 plan took place at 1:00 pm on January 9, 2009, in Bend, Oregon. Following my hearing testimony and argument and receiving evidence, I granted the parties until January 30, 2009 to file supplemental memoranda by order entered on January 14, 2009. Docket No. 21. Both Mr. Grimes and Countrywide filed supplemental memoranda by the deadline.

At the outset, my resolution of this matter has been hampered by the very limited evidence submitted by the parties to aid my determination. Since the Hearing, I have considered Mr. Grimes' testimony and the Deed of Trust ("Deed of Trust") admitted as Countrywide's Exhibit A, as well as the supplemental memoranda submitted by the parties and authorities cited therein. I also have reviewed and take judicial notice of relevant documents included in the docket of Mr. Grimes' bankruptcy case, as authorized by Federal Rule of Evidence 201.

Having carefully considered the parties' arguments in light of the evidentiary record from the Hearing and relevant legal authorities, this Memorandum Opinion sets forth the court's findings of fact and

Page 1 - MEMORANDUM OPINION

conclusions of law under Fed. R. Civ. P. 52(a), applicable with respect to this contested matter under Fed. R. Bankr. P. 9014 and 7052.[1]

## Factual Record

At the time of his bankruptcy filing, Mr. Grimes resided in one unit of a triplex property located at 923 NW Claypool Street, Prineville, Oregon 97754 (the "Claypool Property"). Mr. Grimes purchased the Claypool Property in 2006, and he testified that he acquired the Claypool Property for investment and to provide a source of rental income. Mr. Grimes borrowed $266,250 from Eagle Home Mortgage, Inc., Countrywide's predecessor in interest, on or about February 15, 2006, to purchase the Claypool Property, secured by the Deed of Trust.

Mr. Grimes testified that he no more than skimmed the Deed of Trust before he signed it, but he admitted that the signatures and initials on pages of the Deed of Trust appeared to be his. Section 6 "Occupancy" of the Deed of Trust ("Residence Provision") reads as follows:

> Borrower shall occupy, establish, and use the [Claypool] Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the [Claypool] Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

No evidence was presented that Countrywide or its predecessor in interest ever made any attempt to enforce the Residence Provision. In addition, attached as the last three pages of the Deed of Trust is a "1-4 Family Rider" ("Family Rider") which includes among its "1-4 Family Covenants" a provision that, "Borrower shall maintain insurance against rent loss in addition to the other hazards for which insurance is required...." The Family Rider also includes an assignment of rents and other revenues from the Claypool Property that "shall terminate when all the sums secured by the Security Instrument are paid in full." Finally, Section F "Borrower's Occupancy" of the "1-4 Family Covenants" in the Family Rider specifically provides:

---

[1] Unless otherwise indicated, all further chapter, section and rule references are to the federal Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

Page 2 - MEMORANDUM OPINION

> Unless Lender and Borrower otherwise agree in writing, Section 6 [the Residence Provision] concerning Borrower's occupancy of the [Claypool] Property is deleted.

The Family Rider is dated February 15, 2006, the same date as the preceding deed of trust document.

Mr. Grimes testified that at the time he purchased the Claypool Property, he resided in a single family residence located at 15660 SE Paiute Court, Prineville, Oregon 97754 (the "Paiute Property"). Ultimately, Mr. Grimes was unable to keep up with the payments and surrendered the Paiute Property to a secured creditor shortly before his bankruptcy filing. Mr. Grimes testified that historically, he received rental income from the Claypool Property and was seeking to keep it fully tenanted, except for the unit that he currently is occupying.

Mr. Grimes testified that he had attempted to sell the Claypool Property, with and without the assistance of a real estate agent, without success. His most recent efforts listing the Claypool Property for sale at $150,000 had resulted in no offers.

## Jurisdiction

I have core jurisdiction over this contested matter under 28 U.S.C. §§ 1334 and 157(b)(2)(L).

## Issues

I. What was the value of the Claypool Property on the date of Mr. Grimes' bankruptcy filing?

II. Is Mr. Grimes precluded from modifying the rights of Countrywide as a secured creditor with respect to the Claypool Property by the terms of § 1322(b)(2)?

III. If Mr. Grimes can "cram down" the rights of Countrywide as a secured creditor with respect to the Claypool Property, is Mr. Grimes also entitled to claim a homestead exemption in the Claypool Property?

## Discussion

I. Value

In his Schedule A, Mr. Grimes asserted "under penalty of perjury" that the value of the Claypool Property was $200,000. See Docket No. 1, p. 9. In his chapter 13 plan, Mr. Grimes valued the Claypool Property at $200,000. See Docket No. 6, p. 1. In his testimony at the Hearing, Mr. Grimes again valued the Claypool Property at $200,000, based in part on his efforts to market the Claypool Property, and his

Page 3 - MEMORANDUM OPINION

background of experience investing in real estate. I found Mr. Grimes's testimony regarding the value of the Claypool Property to be credible. Countrywide did not present any evidence as to the value of the Claypool Property at the Hearing. Based on the evidence presented, I found the value of the Claypool Property to be $200,000 as of Mr. Grimes' bankruptcy filing date.

In its supplemental memorandum, Countrywide requested that it be allowed to submit "additional information" regarding the value of the Claypool Property. It based its request on the statement that, "It was unclear at the first confirmation hearing that valuation of the [Claypool Property] would be the subject of the [Hearing] which was to be held on January 9, 2009." I note that the subject of the Hearing was Countrywide's objection to the provision of Mr. Grimes' chapter 13 plan that would cram down Countrywide's secured claim to a value of $200,000. The Record of Proceeding for the preliminary hearing held to schedule the evidentiary hearing on Countrywide's objection to confirmation of Mr. Grimes' chapter 13 plan, attended by counsel for Countrywide, states two issues to be considered at the Hearing: 1) Principle [sic] Residence; and 2) Valuation. See Docket No. 18. Counsel for Mr. Grimes was prepared at the Hearing to submit evidence regarding the value of the Claypool Property through the testimony of Mr. Grimes. Countrywide had the same opportunity to present valuation evidence at the Hearing and presented no evidence as to the value of the Claypool Property.

At the end of the Hearing, based on the evidence presented, I found the value of the Claypool Property as of Mr. Grimes' bankruptcy filing date to be $200,000. Based upon the foregoing record, I see no reason that would justify reopening the record to revisit that finding.

II. Principal Residence

Section 1322(b)(2) provides that a chapter 13 plan may

> modify the rights of holders of secured claims, <u>other than a claim secured only by a security interest in real property that is the debtor's principal residence</u>.... (emphasis added)

Countrywide argues that since Mr. Grimes resided in one of the units of the Claypool Property triplex on his bankruptcy filing date, § 1322(b)(2) precludes Mr. Grimes from modifying Countrywide's rights as a secured creditor with respect to the Claypool Property in his chapter 13 plan. Mr. Grimes responds that he

Page 4 - MEMORANDUM OPINION

acquired the Claypool Property for investment purposes and to generate income.  He argues that the fact that he surrendered the single-family residence Paiute Property and began living in one of the Claypool Property triplex units before he filed his bankruptcy petition does not transform the income producing Claypool Property into his principal residence for purposes of the § 1322(b)(2) restriction on modification.

Countrywide also argues that the terms of the Residence Provision in the Deed of Trust should estop Mr. Grimes from denying that his intent was to reside in the Claypool Property on or about the time he acquired it.  However, as noted above, the Residence Provision was expressly deleted in the Family Rider that was incorporated in the Deed of Trust.  Since the Family Rider is titled "1-4 Family Rider," it appears to recognize, consistent with Mr. Grimes' testimony, that the Claypool Property is a multi-unit residential property, i.e., a triplex.  In addition, the Family Rider includes an assignment of rents that terminates on payment in full of the underlying secured obligation and a provision that the Borrower (Mr. Grimes) maintain insurance against loss of rental income.  It is difficult to know actually what was intended by Countrywide's predecessor in interest in entering into the Deed of Trust in the absence of testimony, but the form of the Deed of Trust documents indicates that a deed of trust form for a single family residence property was used as the basic trust deed form, with the Family Rider added to reflect the reality that the Claypool Property was acquired as a triplex with three units expected to generate rental income, in which Countrywide's predecessor in interest took a security assignment.  Accordingly, the terms of the Deed of Trust ultimately do not contradict Mr. Grimes' position that he acquired the Claypool Property as investment property.

Countrywide further argues that Mr. Grimes should be estopped from denying that the Claypool Property is his principal residence because he claimed a homestead exemption in the Claypool Property.  Mr. Grimes did claim a homestead exemption in the Claypool Property in his Schedule C.  See Docket No. 1, p. 13.

Judge Radcliffe faced virtually the same issues in similar factual circumstances in In re McVay, 150 B.R. 254 (Bankr. D. Or. 1993).  When the McVays filed their chapter 13 bankruptcy petition, they owned real property (the "Property") that was "both a bed and breakfast establishment and the debtors' principal

residence." Id. at 255. The Property was used for a bed and breakfast business when the McVays bought it, and they did not change its use. When the McVays applied for their loan ("Loan") to purchase the Property, they estimated rental income from the Property of $350 per month. The McVays proposed to modify the terms of the Loan in their chapter 13 plan and pay off the modified Loan within 18 months.

The lender argued that the bankruptcy court should use the Oregon state homestead law as a litmus test to determine whether the restriction on loan modification in § 1322(b)(2) applied: If the debtors claimed a homestead exemption in the Property, it should be considered their principal residence, with the result that modification of the Loan would be precluded. Judge Radcliffe noted that, "Renting or leasing a portion of a house for business purposes does not deprive one of Homestead rights in the house." Id. at 256, citing In re Laughlin's Estate, 170 Or. 450, 134 P.2d 961 (1943); and In re Potter's Estate, 145 Or. 167, 59 P.2d 253 (1936).

He also noted that application of the Oregon homestead law to the Property, even if it were determined to be the debtors' principal residence, did not end the inquiry as to whether modification of the lender's secured claim was precluded by § 1322(b)(2). In re McVay, 150 B.R. at 256. Under the terms of § 1322(b)(2), the restriction on modification applies to claims "secured only by a security interest in real property that is the debtor's principal residence." (emphasis added) Where mixed use properties are concerned, courts "have generally focused upon the actual use of the property to produce income." Id. See also In re Hildebran, 54 B.R. 585 (Bankr. D. Or. 1985). Judge Radcliffe found that the Property had "inherent income producing power which the [McVays] are utilizing." Id. at 257. He also determined that the lender's knowledge of the mixed use of the Property at the time the Loan was made was significant. Id. In these circumstances, Judge Radcliffe held that the McVays were not precluded by § 1322(b)(2) from modifying the terms of the Loan (and thus the treatment of the lender's secured claim) in their chapter 13 plan. Id.

In this case, Mr. Grimes testified that he acquired the Claypool Property as investment property, intending to rent the existing units of the triplex. Mr. Grimes' understanding is not inconsistent with the terms of the Deed of Trust, where Countrywide's predecessor in interest took an assignment of rents as

Page 6 - MEMORANDUM OPINION

1 additional security and required that Mr. Grimes maintain insurance against loss of rental income in the
2 Family Rider.  The Family Rider also expressly deleted the Residence Provision in the Deed of Trust.

3 Mr. Grimes testified credibly that he was residing at the Paiute Property when he acquired the Claypool Property and only moved into one of the Claypool Property rental units shortly before his bankruptcy filing, when he could no longer make the payments on the Paiute Property and surrendered it. He further testified that from time to time units would become vacant in the Claypool Property but that he intended to continue renting them to generate income.  I find that Mr. Grimes' claim of a homestead exemption in the Claypool Property is not inherently inconsistent with his intent to maintain the Claypool Property triplex as a mixed-use, income-producing property.

10 In these circumstances, consistent with In re McVay, I conclude that Mr. Grimes is not precluded by § 1322(b)(2) from modifying the treatment of Countrywide's secured claim in his chapter 13 plan.

III.  Homestead Exemption

Countrywide has argued for the first time in its supplemental memorandum that if Mr. Grimes is not precluded from modifying Countrywide's secured claim by § 1322(b)(2), he should not be allowed to take advantage of a homestead exemption claim with respect to the Claypool Property as well.  I reject Countrywide's argument for several reasons as follows:

First, if the value of the Claypool Property results in a cramdown of Countrywide's secured claim to $200,000, which is equivalent to the value of the Claypool Property that I have found, there is no present equity to which a homestead exemption claim can attach.  Any argument that Mr. Grimes will be able to benefit from his claimed homestead exemption in the Claypool Property in the future is purely speculative, with no support in the evidentiary record before me.

Second, as noted above from In re McVay, allowing a homestead exemption claim is not necessarily inconsistent with treating a secured claim as subject to modification with respect to a mixed-use property in which the debtor resides.  The Oregon homestead exemption is interpreted liberally "in light of its goal to 'assure to the unfortunate debtor...the shelter and influence of home.'"  Sticka v. Casserino (In re Casserino), 379 F.3d 1069, 1072 (9th Cir. 2004) (citation omitted).  Nothing in § 1322(b)(2) or in any other provision of

Page 7 - MEMORANDUM OPINION

the Bankruptcy Code precludes a debtor from claiming a homestead exemption in real property with respect to which secured claims can be modified in a chapter 13 plan. In fact, lien claims on the debtor's principal residence that are wholly unsecured by property value can be modified in a chapter 13 plan, whether or not the debtor claims a homestead exemption in the property. See Lam v. Investors Thrift (In re Lam), 211 B.R. 36, 40-42 (9th Cir. BAP 1997).

Finally, Mr. Grimes claimed his homestead exemption in the Claypool Property in his Schedule C filed with his chapter 13 bankruptcy petition on August 20, 2008. See Docket No. 1, p. 13. The § 341(a) meeting in Mr. Grimes' case took place on October 10, 2008. See Docket No. 7. Rule 4003(b) requires that objections to claimed exemptions be filed within 30 days after the § 341(a) meeting or any relevant amendment to Schedule C, whichever is later. Mr. Grimes never has amended his Schedule C filed with his chapter 13 petition. If an objection to a claimed exemption is not filed by the deadline set forth in Rule 4003(b), the objection is waived, whether or not the debtor has a colorable statutory basis for claiming the exemption. Taylor v. Freeland & Kronz, 503 U.S. 638 (1992). If Countrywide's argument against allowing Mr. Grimes the benefit of his homestead exemption in the Claypool Property, raised for the first time in its supplemental memorandum filed on January 30, 2009, is an objection to Mr. Grimes' claimed homestead exemption in the Claypool Property, it is untimely, and it is waived.

## Conclusion

Based on the foregoing findings of fact and conclusions of law, I conclude that Countrywide's objection to confirmation of Mr. Grimes' chapter 13 plan should be overruled. An order consistent with this Memorandum Opinion will be entered contemporaneously by the court.

# # #

cc: Anthony V. Albertazzi
Jennifer Aspaas

Page 8 - MEMORANDUM OPINION